**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**
**WHEELING DIVISION**

**MELISSA CARRIE EVANS,**

      **Plaintiff,**

**v.**                             **Civil Action No.: 5:11-cv-78**
                                        **JUDGE STAMP**

**MICHAEL J. ASTRUE,**
**Commissioner of Social Security,**

      **Defendant.**

**REPORT AND RECOMMENDATION TO THE DISTRICT JUDGE RECOMMENDING**
**THAT THE DISTRICT COURT DENY PLAINTIFF'S MOTION FOR SUMMARY**
**JUDGMENT [13], GRANT DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**
**[17], AND AFFIRM THE DECISION OF THE ADMINISTRATIVE LAW JUDGE**

## I.   INTRODUCTION

On June 6, 2011, Plaintiff Melissa Carrie Evans ("Plaintiff"), by counsel Philip S. Isner, Esq.,

filed a Complaint in this Court to obtain judicial review of the final decision of Defendant Michael

J. Astrue, Commissioner of Social Security ("Commissioner" or "Defendant"), pursuant to Section

205(g) of the Social Security Act, as amended, 42 U.S.C. § 405(g). (Complaint, ECF No. 1.)  On

August 5, 2011, the Commissioner, by counsel Helen Campbell Altmeyer, Assistant United States

Attorney, filed an answer and the administrative record of the proceedings.  (Answer, ECF No. 9;

Administrative Record, ECF No. 10.)  On September 6, 2011, and September 30, 2011, Plaintiff and

the Commissioner filed their respective Motions for Summary Judgment.  (Pl.'s Mot. for Summ. J.

("Pl.'s Mot."), ECF No. 13; Def.'s Mot. for Summ. J. ("Def.'s Mot."), ECF No. 17.)  Following

review of the motions by the parties and the administrative record, the undersigned Magistrate Judge

now issues this Report and Recommendation to the District Judge.

## II.    BACKGROUND

### A.    *Procedural History*

On August 30, 2007, Plaintiff protectively filed her first application under Title XVI of the Social Security Act for Supplemental Security Income ("SSI"), alleging disability that began on November 2, 2005.  (R. at 11.)  This claim was denied on October 23, 2007, and Plaintiff did not pursue her claim further.  (R. at 86.)  On March 10, 2008,[1] Plaintiff protectively filed another application for SSI benefits, again alleging disability that began on November 2, 2005.  (R. at 11, 145.)  This claim was initially denied on May 8, 2008 and was denied again upon reconsideration on December 18, 2008.  (R. at 91, 99.)  On February 26, 2009, Plaintiff filed a written request for a hearing (R. at 102), which was held before United States Administrative Law Judge ("ALJ") George A. Mills III on May 12, 2010 in Morgantown, West Virginia.  (R. at 30, 118-22.)  Plaintiff, represented by counsel Philip S. Isner, Esq., appeared and testified, as did Eugene Czuczman, an impartial vocational expert.  (R. at 11, 31-77.)  On June 21, 2010, the ALJ issued an unfavorable decision to Plaintiff, finding that she was not disabled within the meaning of the Social Security Act.  (R. at 11-24.)  On April 6, 2001, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner.  (R. at 1-3.)

### B.    *Personal History*

Plaintiff was born on May 4, 1975, and was 32 years old at the time she filed her first SSI claim.  (R. at 145.)  She completed almost a year of college (R. at 42) and has prior work experience

---

[1] The ALJ's decision lists a date of February 29, 2008 for when Plaintiff filed her current application for SSI.  (R. at 11.)  However, her application, contained as Exhibit 1D in the Administrative Record, refers to a date of March 10, 2008.  (R. at 145.)  The only mention of February 29, 2008 in the application refers to Plaintiff's "fugitive felon/parole or probation violator" status as of that date.  (R. at 146.)

as a bell ringer for the Salvation Army, a chiropractic assistant, a convenience store clerk, a waitress, an ice cream stand clerk, gas pump attendant, and a clubhouse manager at a golf course (R. at 197, 225). She was married at the time she filed her initial claim but is now divorced. (R. at 40, 145.) She has two dependent daughters and shares custody of them with her ex-husband. (R. at 40-41.)

## C.    *Medical History*

### 1.    **Medical History Pre-Dating August 30, 2007**

The earliest medical information in the record dates to September 23, 1994. (R. at 448.) Her doctor noted that she felt "the best she has in a long time." (*Id.*) At that time, Plaintiff was taking Citracel, Zantac, and Paxil. (*Id.*)

On December 5, 1995, Plaintiff reported mood swings that lasted "minutes in duration." (R. at 447.) She appeared "dramatic" and "tearful" during this appointment. (*Id.*) Plaintiff also told her doctor that she was attending Valley Mental Health in Parsons. (*Id.*)

On February 21, 1995, Plaintiff told her doctor that she was taking Zoloft and lithium as prescribed by her psychiatrist in Parsons. (R. at 446.) However, on December 1, 1995, Plaintiff stated that she was "weaned off" both lithium and Zoloft earlier that year. (R. at 445.)

On July 14, 1997, Plaintiff told her family doctor that she had been "spending time being a hypochondriac." (R. at 444.) She had thoughts about slicing her wrist even though she had no definite plan to do anything to hurt herself. (*Id.*) Her doctor assessed recurrent depression, and Plaintiff was prescribed Zoloft. (*Id.*) On July 24, 1997, Plaintiff noted that she was feeling better and no longer had thoughts of killing herself. (R. at 443.)

On January 11, 1999, Plaintiff told her family doctor that she still felt depressed and that "sometimes she has fleeting thoughts of hurting herself" but no plan. (R. at 440.) Two months later,

she reported that her mood swings were beginning again after fighting with her husband. (R. at 439.) At this appointment, Plaintiff also stated that she had experienced thoughts of killing herself by ingesting an entire bottle of Tylenol. (*Id.*)

On June 15, 2006, Plaintiff visited Dr. William C. Mitchell with complaints of bipolar disorder, depression, and mania. (R. at 271.) Plaintiff reported a "spending spree" and "obsessive lying to her husband." (*Id.*) Dr. Mitchell's examination did not reveal any suicidal ideations or plans, and he diagnosed her with depression/bipolar illness. (*Id.*) Dr. Mitchell continued Plaintiff on 20 milligrams of Lexapro daily and placed her on 500 milligrams of Depakote twice daily. (*Id.*)

On September 19, 2006, Plaintiff was admitted to Chestnut Ridge Hospital for "increasing mood swings ranging from feeling like a queen of the world to worthless." (R. at 274.) Plaintiff had "suicidal ideations" when admitted to Chestnut Ridge. (*Id.*) She reported feeling "guilty" about having an affair and amassing "huge credit card bills." (*Id.*) Plaintiff was discharged on September 21, 2006. (*Id.*) At discharge, she was diagnosed with bipolar disorder, currently depressed; irritable bowel syndrome; social stressors; and a Global Assessment of Functioning ("GAF") of 55. (*Id.*) She was continued on 20 milligrams of Lexapro daily and was switched to a prescription for extended release lithium carbonate. (*Id.*)

## 2.    Medical History Post-Dating August 30, 2007

On October 12, 2007, the Administration asked Dr. William Fremouw to provide Plaintiff with a mental status examination. (R. at 283.) Patient reported being "bipolar, depressed, and OCD;" however, Dr. Fremouw specifically noted that Plaintiff does not suffer from obsessive-compulsive disorder. (R. at 283-84.) Plaintiff also stated that she felt "hyper but very sad" because of having to make decisions about her marriage and her family. (R. at 285.) Furthermore, Plaintiff

reported a history of binge drinking but stated she no longer drinks alcohol. (Id.) Dr. Fremouw diagnosed bipolar 1 disorder, most recent episode mixed. (R. at 286.) He reported that Plaintiff was to remain in outpatient psychiatric care. (*Id.*)

On October 17, 2007, Plaintiff visited Dr. Zheng at University Health Associates for a medications check. (R. at 353.) During this appointment, Plaintiff reported feeling "very frustrated and confused" over her separation from her husband. (*Id.*) Dr. Zheng noted that she appeared "unhappy" and "sad" but displayed no other abnormalities. (*Id.*) He assigned a GAF of 51-60. (R. at 354.)

On October 19, 2007, Plaintiff met with Bob Marinelli, Ed.D., to complete a psychiatric review for the Administration. (R. at 287.) Dr. Marinelli found that Plaintiff did not have a severe impairment and based his disposition on Listing 12.04 (Affective Disorders). (*Id.*) He noted that she had mood disturbance accompanied by a full or partial manic or depressive syndrome and bipolar syndrome with a history of episodic periods with both manic and depressive syndromes. (R. at 290.) Dr. Marinelli found that Plaintiff's restrictions of daily living activities, difficulties in maintaining social functioning, and difficulties in maintaining concentration, persistence, or pace were all mild. (R. at 297.) Finally, Dr. Marinelli noted that "[c]laimant's reports of y functioning appear credible." (R. at 299.)

On November 9, 2007, Plaintiff was hospitalized at Chestnut Ridge Hospital for "depressive symptoms and suicidal ideation with a plan of cutting her wrist." (R. at 301.) She reported feelings of guilt and hopelessness and that she was stressed because of her separation from her husband and unemployment. (*Id.*) At discharge, Plaintiff was cooperative, alert, and oriented and had no suicidal ideations. (*Id.*) Her mood was "well," and she had good insight and judgment. (*Id.*) Plaintiff was

discharged on November 13, 2007 with a diagnosis of bipolar disorder, depressed type. (*Id.*) One day later, Plaintiff saw Dr. Zheng for a medications check. She stated that she felt "improved" and "tolerated her meds well." (R. at 352.) Dr. Zheng's notes reveal that Plaintiff had a "sad" mood but did not display any significant abnormalities. (*Id.*) He assigned a GAF of 51-60. (R. at 351.)

On November 27, 2007, Plaintiff was admitted to Chestnut Ridge Hospital for "worsening depressive symptoms for the past 2 weeks which [sic] suicidal ideations." (R. at 317.) According to hospital records, this was the "worst" Plaintiff had ever felt. (*Id.*) At discharge, she "was feeling well and appeared cheerful." (*Id.*) Plaintiff was diagnosed with bipolar disorder, currently depressed with cluster B traits and was advised to follow up with Dr. Zheng and with her therapist. (*Id.*)

Plaintiff continued to see Dr. Zheng for medications checks in December 2007 and January-February 2008. On December 12, 2007, Plaintiff reported that she was working four hours a day at a temporary job and that she "has been doing well." (R. at 345.) However, she still experienced stress from daily life and felt "angry and upset" over her ex-husband. (*Id.*) Dr. Zheng continued her on her current medications and assigned a GAF of 51-60. (R. at 346.) Notably, Dr. Zheng assigned the same GAF and the same medication dosages at the January and February appointments. (R. at 342, 344.)

On March 21, 2008, Plaintiff attended another follow-up appointment with Dr. Zheng. (R. at 339.) Dr. Zheng noted that she appeared "sad" and "unhappy" with a labile affect. (*Id.*) Plaintiff reported that she thought her medications were helping, but that she also felt guilty, angry, and resentful about her divorce. (*Id.*) She also noted that she continued to experience irritability and anger spells. (*Id.*) Dr. Zheng increased Plaintiff's dosage of Seroquel. (R. at 340.)

On May 7, 2008, Dr. Philip Comer completed a Mental Residual Functional Capacity Assessment of Plaintiff. (R. at 369-71.) Notably, he determined that she was moderately limited in her ability to maintain attention and concentration for extended periods and her ability to perform activities pursuant to a schedule, maintain regular attendance, and be punctual. (R. at 369.) Furthermore, he found that she was moderately limited in her ability to complete a normal workday and workweek without interruptions from psychological symptoms, her ability to accept instructions and respond appropriately to criticism, her ability to get along with coworkers, and her ability to respond to changes at work. (R. at 370.) Overall, Dr. Comer determined that Plaintiff's "functional limitations do not call for a RFC allowance. She appears to have the mental/emotional capacity for work related activity in a low stress/demand work environment that can accommodate some mood lability and her physical limitations." (R. at 371.)

On May 23, 2008, Dr. Zheng met with Plaintiff for a medications check, and Plaintiff reported that she was emotional and feeling miserable after her divorce was finalized. (R. at 493.) Dr. Zheng noted an anxious and sad mood and a labile affect. (*Id.*) Plaintiff reported the same feelings at her June 13, 2008 medications check. (R. at 491.) Dr. Zheng's assessment did not change, and he assigned a GAF of 51-60. (R. at 492.)

On August 8, 2008, Plaintiff told Dr. Zheng that she had been "stable" but also felt irritable, sad, and angry at times. (R. at 489.) She admitted to having mood swings, racing thoughts, and poor judgment. (*Id.*) Dr. Zheng noted a stable mood with a stable and appropriate affect. (*Id.*) He did not change his assessment, continued Plaintiff's medications, and assigned a GAF of 51-60. (R. at 490.)

On September 3, 2008, Dr. Fremouw examined Plaintiff again. (R. at 387.) Plaintiff

reported that her divorce had recently been finalized, but that she was experiencing "racing thoughts about revenge" against her ex-husband because he had a new girlfriend.  (R. at 388.)  She also reported that she was currently binge drinking.  (*Id.*)  Dr. Fremouw noted that Plaintiff had last worked steadily in 2000 to 2001, but she also reported doing some babysitting for friends.  (*Id.*)

After performing a mental status examination, Dr. Fremouw noted that Plaintiff's mood was "all over" but reported that she was currently "on the high side."  (*Id.*)  Plaintiff stated that her medications helped to stabilize her sleep patterns and also decrease the severity of her manic episodes.  (*Id.*)  Her persistence and pace were within normal limits, but she had some mild impairment in concentration.  (*Id.*)  Plaintiff also reported having social contacts with others through scrapbooking, hunting, and fishing.  (*Id.*)  She indicated that she was trying to "avoid the bars and avoid men" and was no longer going to the bars to meet men as she had before.  (*Id.*)  Overall, Dr. Fremouw diagnosed "bipolar disorder, unspecified" and noted that Plaintiff was currently at a "moderate level of impairment."  (R. at 390.)

On September 19, 2008, Plaintiff told Dr. Zheng that she felt manic, hypersexual, irritable, and anxious.  (R. at 487.)  Dr. Zheng noted an anxious mood with a labile affect.  (*Id.*)  He ordered that Plaintiff be admitted to the adult unit for further treatment and assigned a GAF of 31-40.[2]  (R. at 488.)  About a month later, Plaintiff told Dr. Zheng that she felt "miserable" because she "always feels lonely."  (R. at 485.)  Dr. Zheng noted that Plaintiff had a sad and anxious mood with an appropriate affect.  (*Id.*)  He increased her dosage of Seroquel, continued her lithium, and assigned a GAF of 51-60.  (R. at 486.)  A few weeks later, Dr. Zheng assigned the same GAF and noted that Plaintiff had a sad and anxious mood with a labile affect.  (R. at 484.)

---

[2] Hospital records from this admission were not included in the administrative record.

On December 5, 2008, Plaintiff told Dr. Zheng that she decreased her dosage of Abilify because it made her agitated and irritable. (R. at 480.) She reported feeling less angry towards her ex-husband. (*Id.*) Dr. Zheng noted that Plaintiff had a sad mood with an appropriate affect. (*Id.*) He continued Plaintiff's medications, added borderline personality disorder to his assessment, and assigned a GAF of 60. (R. at 481.)

On December 10, 2008, Dr. Frank Roman completed a psychiatric review technique and Mental Residual Functional Capacity Assessment of Plaintiff. (R. at 391, 407.) He noted that she had mild difficulties in her daily activities of living and in maintaining concentration, persistence, and pace. (R. at 401.) He also noted that she had moderate limitations in maintaining social functioning. (*Id.*) Dr. Romer reported that Plaintiff was moderately limited in her ability to complete a normal workday and workweek without interruptions, her ability to accept instructions and respond to criticism, and her ability to maintain socially appropriate behavior. (R. at 406.) Overall, however, Dr. Romer concluded that Plaintiff's "deficits do not meet or equal a listing" and that she "appear[ed] able to follow routine work in a low stess [sic] setting." (R. at 407.)

On December 19, 2008, Plaintiff met with Dr. Kassawat for a medications check. (R. at 478.) She reported racing thoughts and a panic attack. (*Id.*) Dr. Kassawat restarted Plaintiff on Klonopin and assigned a GAF of 61-70. (R. at 479.)

On January 7, 2009, Plaintiff told Dr. Zheng that she had been feeling very panicky, restless, and agitated over the past few weeks. (R. at 476.) She reported that she felt hopeless and didn't feel safe to go home even though she had no plans to harm herself. (*Id.*) Dr. Zheng noted that Plaintiff had an anxious and sad mood with a constricted affect. (*Id.*) He ordered her to be admitted to the

inpatient adult unit for further treatment and assigned a GAF of 31-40.[3]  (R. at 477.)

On January 14, 2009, Plaintiff told Dr. Zheng that she had been feeling better since being admitted on January 7, 2009.  (R. at 474.)  She reported being less irritable and believed that her medications had been helping.  (*Id.*)  Dr. Zheng noted that Plaintiff had a "mildly sad" mood with an appropriate affect.  (*Id.*)  He continued Plaintiff's medications and assigned a GAF of 61-70.  (R. at 475.)

At her February 20, 2009 medications check with Dr. Zheng, Plaintiff reported that she was feeling restless, but that she felt better and was "more future oriented."  (R. at 472.)  Dr. Zheng noted that Plaintiff had an anxious mood with an appropriate affect.  (*Id.*)  He discontinued Plaintiff's Abilify, started her on Cogentin, removed borderline personality disorder from his assessment, and assigned a GAF of 60.  (R. at 473.)

On March 11, 2009, Plaintiff told Dr. Zheng that she felt "more calm" and that her feelings of restlessness and anxiety had improved.  (R. at 470.)  Dr. Zheng noted that Plaintiff had a mildly sad mood with an appropriate affect.  (*Id.*)  He decreased her dosage of Cogentin, continued her other medications, and assigned a GAF of 61-70.  (R. at 471.)

At her March 26, 2009 medications check, Plaintiff told Dr. Kassawat that she was not doing well and that she had been seeing a "rolling movie" about her children that scared her.  (R. at 468.)  Dr. Kassawat noted that Plaintiff had a stable affect.  (*Id.*)  He increased her dosage of Seroquel and assigned a GAF of 61-70.  (R. at 469.)

On April 15, 2009, Plaintiff told Dr. Zheng that her new medications regimen was helping and that her mood was "better" even though she continued to experience mood swings, irritability,

---

[3] Hospital records from this admission were not included in the administrative record.

restlessness, and poor concentration.  (R. at 466.)  Dr. Zheng noted that she had a sad and anxious mood with a constricted affect.  (*Id.*)  He discontinued her Cogentin, continued her other medications, and assigned a GAF of 60.  (R. at 467.)

On May 20, 2009, Plaintiff told Dr. Zheng that she felt stable on her medications but that she still experiences mood swings every month during her menstrual cycle.  (R. at 464.)  She reported that she was "future-oriented," "more hopeful," and was looking for a therapist.  (*Id.*)  Dr. Zheng noted that Plaintiff had a euthymic mood with a stable and appropriate affect.  (*Id.*)  He transferred her care to Dr. Gill, increased her dosage of Klonopin around her menstrual cycle, continued her other medications, and assigned a GAF of 61-70.  (R. at 465.)

Plaintiff began treatment with Dr. Ali Siavashi on July 22, 2009.  (R. at 460.)  At this appointment, Plaintiff denied experiencing any "frank manic or hypomanic episodes recently," but she noted that she was "devastated" after breaking up with a boyfriend. (*Id.*)  Plaintiff stated that she was experiencing a "depressed mood and insomnia" but denied having "racing thoughts." (*Id.*)  Dr. Siavashi informed Plaintiff of the "role of alcohol in mood lability" after Plaintiff reported getting intoxicated three or four days in a row when she does not have her children.  (*Id.*)  He diagnosed her with bipolar disorder (Type I), most recent episode depressed, alcohol abuse, and borderline personality disorder.  (R. at 461.)  He also assessed a GAF of 65.  (*Id.*)  Dr. Siavashi decided to continue Plaintiff's medications and advised her to follow up in a month.  (*Id.*)

In August 2009, Plaintiff reported that the pain from her breakup continued to be a "significant source of distress."  (R. at 458.)  She told Dr. Siavashi that she had been drinking alcohol to "cope with the pain."  (*Id.*)  Dr. Siavashi noted that Plaintiff was very "pleasant and sociable" and had normal motor and speech functions.  (R. at 458-59.)  His assessment remained

unchanged and he assigned a GAF of 60.  (R. at 459.)  Plaintiff returned a week later for a follow-up

appointment.  (R. at 456.)  Dr. Siavashi noted that she continued to remain "dysthymic secondary"

to her recent breakup and that Plaintiff reported drinking alcohol to "numb the pain."  (*Id.*)  She also

noted that starting birth control pills caused her to be "full of rage and very irritable."  (*Id.*)  Dr.

Siavashi stated that Plaintiff was again "pleasant and sociable" and had an affect of "mood

congruent with one crying spell."  (*Id.*)  He added an adjustment disorder with depressed mood to

his assessment, continued her medications, and assigned a GAF of 50.  (R. at 457.)

Plaintiff met with Dr. Siavashi for a follow-up appointment on September 25, 2009.  (R. at

454.)  She told him that she felt "normal" and the "best that she has felt in a quite some time."  (*Id.*)

Plaintiff thought that her moods had improved after being taken off birth control pills and increasing

her Seroquel dosage.  (*Id.*)  However, she had also met a new man at a bar and had started dating

him.  (*Id.*)  Dr. Siavashi noted that Plaintiff was "pleasant and sociable" with a "euthymic" mood.

(*Id.*)  He continued her medications, removed the adjustment disorder from his assessment, and

assigned a GAF of 65.  (R. at 455.)

At Plaintiff's October 9, 2009 appointment with Dr. Siavashi, she reported that she was no

longer in a committed relationship with her new boyfriend but that she continued to be physically

intimate with him.  (R. at 452.)  She reported having "some suicidal thoughts" but said she would

not kill herself because of her children.  (*Id.*)  Dr. Siavashi's assessment remained unchanged, he

continued Plaintiff's medications, and assigned a GAF of 60.  (R. at 453.)

On October 30, 2009, Plaintiff had another appointment with Dr. Siavashi.  (R. at 449.)  She

reported she had been having "fits of rage and racing thoughts" and a "depressed mood and inability

to concentrate."  (*Id.*)  Plaintiff stated that she had some sporadic suicidal ideation but denied having

any intent or a plan. (*Id.*) Dr. Siavashi noted that her "affect instability continues to be secondary to her social situation." (*Id.*) Plaintiff reported that she continued to hang out at bars. (*Id.*) She was fixated on an ex-boyfriend and a high school friend who she felt betrayed her by dating this ex-boyfriend. (*Id.*) Plaintiff displayed "some mild psychomotor retardation" and also a dysthymic mood with "multiple crying spells." (*Id.*) Dr. Siavashi did not change his assessment, but he increased Plaintiff's dosage of Seroquel and assigned a GAF of 50. (*Id.*)

On November 6, 2009, Plaintiff reported to Dr. Siavashi that her "mood swings and fits of rage" had tempered with the increase in Seroquel but that she was now feeling "excess sedation." (R. at 530.) She thought that her mood symptoms were secondary to her gynecological issues as she was scheduled to have a hysterectomy. (*Id.*) Dr. Siavashi noted that she had insight into how she was using the current man in her life. (*Id.*) Her affect was "mood congruent" and she was "very pleasant and cooperative." (*Id.*) Dr. Siavashi did not change his assessment, decreased Plaintiff's Seroquel dosage, continued her other medications, and assigned a GAF of 50. (R. at 531.)

At her appointment two weeks later, Plaintiff reported that she was "not doing well" and described "rapid mood swings, hatred, violence, selfishness, and the drama queen part of me is coming out." (R. at 527.) She stated that she had met a man at a bar and became physically intimate with him. (*Id.*) Plaintiff told the current man in her life what had happened, and he forgave her but "called off whatever relationship they had." (*Id.*) She reported feeling "extremely guilty" about the incident. (*Id.*) Dr. Siavashi noted that she was fixated on "how unfaithful she had been in every relationship" and that her mood was "all over the place." (R. at 528.) He privately noted that he continued to remain suspicious that Plaintiff does not have bipolar disorder (Type I) and that her symptoms were a "manifestation of her borderline personality disorder, particularly in regards to

racing thoughts, mood, affect and instability." (*Id.*) He continued her medications and assigned a GAF of 50. (*Id.*)

On December 4, 2009, Plaintiff told Dr. Siavashi that she was in a "decent mood" and was "doing a lot better." (R. at 524.) She noted that she was again romantically involved with the man who had left her in November. (*Id.*) She admitted that her irritability and racing thoughts correlate "directly with the status of her relationship with males." (*Id.*) Dr. Siavashi noted that she had a euthymic mood and a stable and mood congruent affect. (R. at 525.) He continued to remain suspicious that Plaintiff has bipolar disorder (Type I), continued her medications, and assigned a GAF of 60. (*Id.*) Two weeks later, Plaintiff told Dr. Siavashi that her relationship had ended after she became physically intimate with a friend she saw at the bar, but that she was "fine with everything" because she "realizes that she does not need to be in a bad relationship in order to be happy." (R. at 522.) At this appointment, Dr. Siavashi's assessment remained the same. (R. at 522-23.)

During her first appointment with Dr. Siavashi in 2010, Plaintiff noted that had been hospitalized from December 22-24, 2009 after taking an overdose of Klonopin. (R. at 519.) She stated that the overdose had been caused when she and her new boyfriend broke up. (*Id.*) However, Plaintiff reported that she was still physically intimate with him. (*Id.*) Dr. Siavashi noted that she was fixated on her relationship and that she had a euthymic mood with a mood congruent and stable affect. (R. at 520.) His assessment did not change, he decreased her lithium dosage, and he assigned a GAF of 55. (*Id.*)

On January 29, 2010, Plaintiff reported that her boyfriend had told her that he only wanted to be friends and that she was "extremely stressed out" because of an upcoming hysterectomy. (R.

at 516.)  Dr. Siavashi noted that she had an "okay" mood and appeared fixated on her relationship. (R. at 517.)  He continued her medications, removed bipolar disorder (Type I) from his assessment, and assigned a GAF of 50.  (*Id.*)

On February 19, 2010, Plaintiff read a letter to Dr. Siavashi which detailed her anger about her hysterectomy and her recent breakup with her boyfriend.  (R. at 513.)  Dr. Siavashi noted that the hysterectomy contributed to Plaintiff's anger, but that these symptoms were secondary to her breakup.  (*Id.*)  Plaintiff reported that she had not been drinking alcohol since her surgery, but that she had also had some suicidal thoughts, mainly at night.  (R. at 514.)  After completing a mental status examination, Dr. Siavashi noted that Plaintiff had an "angry" mood and that her affect was mood congruent and labile.  (*Id.*)  He continued Plaintiff's medications, did not change his assessment, and assigned a GAF of 50.  (R. at 514-15.)  At the end of February, Plaintiff reported that she was still extremely angry at her ex-boyfriend for breaking up with her.  (R. at 511.)  Dr. Siavashi's assessment remained unchanged, and he assigned the same GAF.  (R. at 512.)

On March 5, 2010, Plaintiff told Dr. Siavashi that she had been "acting really reckless" and felt like she was "in a race car."  (R. at 508.)  She noted that she had been having "racing thoughts" and that she had been experiencing hypersexual behavior.  (*Id.*)  Dr. Siavashi noted that her mood was "really irritable" and that her affect was mood congruent.  (R. at 509.)  He thought that Plaintiff presented with hypomania, but was unsure whether it was true hypomania or was "secondary to inwardly directed anger as a result of borderline personality disorder."  (*Id.*)  He did not change his assessment, increased her dosage of Seroquel, continued her other medications, and assigned a GAF of 45.  (*Id.*)  A week later,  Dr. Siavashi told Plaintiff that he had not seen any evidence of bipolar disorder, and Plaintiff "did not offer any resistance to this."  (R. at 506.)  He did not change his

assessment, continued her medications, and assigned a GAF of 45.  (*Id.*)

On March 19, 2010, Plaintiff told Dr. Siavashi that she was having a "good day" and that she was "doing okay with good energy levels."  (R. at 503.)  Dr. Siavashi did counsel Plaintiff about self-destructive behavior after she reported that she had been physically intimate with an ex-boyfriend and another man.  (*Id.*)  He noted that her mood was euthymic and that her affect was mood congruent and stable.  (R. at 504.)  Dr. Siavashi did not change his assessment, continued Plaintiff's medications, and assigned a GAF of 50.  (*Id.*)

At the end of March 2010, Plaintiff stated that she felt like she was "getting railroaded."  (R. at 500.)  She told Dr. Siavashi she had almost given up on marriage and having a happy family.  (R. at 501.)  Dr. Siavashi noted that Plaintiff was physically intimate with multiple men who wanted nothing more than a sexual relationship.  (*Id.*)  Plaintiff reported that she was having racing thoughts again, and Dr. Siavashi increased her dosage of Seroquel.  (R. at 501-02.)  At this appointment, Plaintiff's mood was "not happy but not sad" and her affect was mood congruent and stable.  (R. at 501.)  Dr. Siavashi did not change his assessment, continued Plaintiff's medications, and assigned a GAF of 60.  (R. at 501-02.)  This assessment and GAF remained unchanged at Plaintiff's April 9, 2010 appointment.  (R. at 498-99.)

Later in April 2010, Plaintiff stated that she had a "rough week" and that she was still in love with her ex-boyfriend.  (R. at 496.)  She also reported that she was under "severe financial distress" and had an upcoming SSI disability hearing.  (*Id.*)  Dr. Siavashi noted that Plaintiff's mood was "ok" and that her affect was mood congruent and stable.  (*Id.*)  He did not change his assessment, continued her medications, and assigned a GAF of 60.  (R. at 496-97.)

On May 7, 2010, Plaintiff stated that she was "very angry" towards her ex-boyfriend because

of the way he treats her. (R. at 494.) She continued to be physically intimate with him whenever she sees him at the local bar. (*Id.*) Dr. Siavashi reported that Plaintiff had a "mad" mood and that her affect was mood congruent, but that she was in good spirits by the end of the session. (*Id.*) He did not change his assessment, decreased her lithium dosage, continued her other medications, and assigned a GAF of 60. (R. at 494-95.)

On July 12, 2010, Dr. Siavashi wrote a letter to the Administration to support Plaintiff's Social Security appeal. (R. at 583.) In this letter, Dr. Siavashi stated that he has diagnosed Plaintiff with Mood Disorder Not Otherwise Specified and Borderline Personality Disorder. (*Id.*) He noted that people with Borderline Personality Disorder "live on an emotional roller coaster" and that it is "very destructive to social functioning." (*Id.*) Dr. Siavashi further stated his belief that Plaintiff has a "severe mental illness which causes her symptoms" and that her symptoms are "not caused by relationship decisions or influenced by alcohol intake." (R. at 584.) He stated that a review of Plaintiff's records revealed that she had spent a "considerable amount of time" in the GAF range of 31-50, which coincided with a "severe impairment." (*Id.*) Overall, Dr. Siavashi believed that Plaintiff was not "suitable to work." (*Id.*)

### D.    *Testimonial Evidence*

At the ALJ hearing held on May 12, 2010, Plaintiff testified that she is divorced with two children. (R. at 40.) She shares custody of her children with her ex-husband and receives monthly child support. (R. at 41.) Plaintiff graduated from high school and attended almost a year of college at Garrett County Community College. (R. at 42-43.) She receives assistance in the form of HUD, food stamps, and a medical card. (R. at 59.)

Plaintiff testified that she has generally been a "stay-at-home mom." (R. at 44.) She moved

to Montana right after she graduated from high school and worked as a babysitter for approximately six months. (*Id.*) She was also a waitress in Montana for about a month. (R. at 45.) Plaintiff then moved home because of illness and worked at two different convenience stores as a clerk and gas pump attendant. (R. at 44.) According to Plaintiff, she then stopped working because she married and her husband did not want her to work. (*Id.*) She worked as a chiropractor's assistant from August 1996 to February 1997 (R. at 46.) Plaintiff also worked as a clubhouse manager at a golf course during 1999 and then 2001. (R. at 47.) At the golf course, she was responsible for the snack kitchen, deposits, emptying trash cans on the golf course, and golf cart maintenance. (R. at 47-48.) Finally, Plaintiff worked as a bell ringer for the Salvation Army during the 2007 Christmas season. (R. at 45.)

Plaintiff further testified that the impairment she is treating is bipolar disorder. (R. at 52.) At the time of the hearing, she took Seroquel, lithium, thyroid medication, and nerve pills. (*Id.*) Plaintiff told the ALJ that her medication was not doing well because her doctor wanted to wean her off the lithium because she has been taking it for so long. (R. at 53.) Plaintiff takes thyroid medication because the lithium attacks her thyroid. (*Id.*)

At the hearing, Plaintiff testified that she has been hospitalized at least "seven to eight times" since she was twenty-nine years old. (R. at 56.) She has been hospitalized because of problems stemming from bipolar disorder and from "added stress." (*Id.*) Plaintiff was last hospitalized during December 21-24, 2009. (R. at 54.) Since 2008, she has steadily seen counselors. (R. at 58.) She usually goes once a week for counseling and for medications checks. (*Id.*)

Plaintiff also testified regarding her daily activities. She stated that she has no problems with personal hygiene unless she "get[s] in a funk." (R. at 61.) Plaintiff stated that she gets "in a funk"

up to four times per year and then "it might be three or four days before [she] leave[s] [her] apartment or take[s] a shower." (R. at 61, 62.) She cooks the "bare minimum" for herself and her children. (R. at 62.) She tries to get involved with her children's activities in the Junior Misses Club and gets her children ready for school each day. (R. at 62-63.) Once in a while, she'll have coffee with a friend. (R. at 63.) As far as chores, Plaintiff will "pick up the house" and do laundry at a laundromat. (R. at 64, 65.) She enjoys reading, but testified that it takes her longer to read now, and she also enjoys walking as long as she is "left alone." (R. at 64.) She will go to the market, but usually has a list of items because she is usually "flustered" and does not "want to be bothered." (R. at 66.) Plaintiff testified that she does not belong to any clubs or organizations. (*Id.*) She stated that she finds it difficult to go out in public because she feels that "everybody's watching [her]" and "[her] skin starts to crawl, [she] gets nauseous and [she] ha[s] to get up and leave." (R. at 57.) She tries not to take her children out without having someone else to go with her. (*Id.*)

Plaintiff's attorney asked her what she thinks prevents her from working with respect to her bipolar disorder. (R. at 67.) Plaintiff answered that she does not know what kind of week she will have because she never knows if she will be sleepy, hyper, or in another mood. (*Id.*) She also testified that she has a "movie reel" that plays in her head of things that could happen to her children and that this causes her to experience panic attacks. (R. at 67-68.) According to Plaintiff, she could not work when she has these episodes because they make her unable to function. (R. at 69.) Furthermore, Plaintiff testified that being around people and having deadlines at work would create added stress. (*Id.*)

### E.    *Vocational Evidence*

Also testifying at the hearing was Eugene Czuczman, a vocational expert. Mr. Czuczman

characterized Plaintiff's past work within a range of light and unskilled to light and skilled. (R. at 70-71.) Her work as a waitress, babysitter, convenience store clerk, gas pump attendant, and chiropractic assistant was characterized as light and semi-skilled. (R. at 70.) Her work as a bell ringer and ice cream stand clerk was characterized as light and unskilled. (R. at 70-71.) Finally, Mr. Czuczman characterized Plaintiff's past work as the clubhouse manager as customarily light and skilled.[4] (R. at 70.) With regards to Plaintiff's ability to return to her prior work, Mr. Czuczman gave the following responses to the ALJ's hypothetical:

> Q: The profile is between the ages of 32 and 35. She has a high school education and she has one year of college. And, as she indicated, some of the past work that she did, however, she apparently said she was more of a stay-at-home mom after she got married. . . . So, the State Agency, for a hypothetical individual indicated no physical exertional limitations. Non-exertionally consider only unskilled work. Only occasional contact with supervisors, coworkers, and the public. And no rapid production, piece rate, or quota work. Sometimes described as low stress. If that would be the case, Mr. Czuczman, would any of the work she did in the past be available to a hypothetical person limited as I've described?
>
> A: No, Your Honor.
>
> . . .
>
> A: Primarily because of the occasional contact with the public.

(R. at 71.)

Incorporating the above hypothetical, the ALJ then questioned Mr. Czuczman regarding Plaintiff's ability to perform other work at varying exertional but unskilled levels. At the heavy level, the hypothetical individual, if she could not return to Plaintiff's past work, would be able to

---

[4] Mr. Czuczman noted that Plaintiff had indicated that her work as the clubhouse manager required lifting 30 pounds at times and that this would be work performed at the medium exertional; however, he noted that this work is customarily light. (R. at 70.)

function as a lumber handler, with 75,000 jobs nationally and 600 in the region encompassing West Virginia along with its "five recognized metropolitan (INAUDIBLE) areas." (R. at 72.) At the medium level, the hypothetical individual could work as a scrap sorter, with 60,000 jobs nationally and 100 regionally. (*Id.*) At the light level, a machine cleaner, with 60,000 jobs nationally and 400 regionally. Finally, Mr. Czuczman testified that at the sedentary level, the hypothetical individual could function as a laminator, with 75,000 jobs nationally and 400 regionally. (*Id.*) Mr. Czuczman noted that his answers represented only a sample of available jobs. (*Id.*)

Finally, the ALJ questioned Mr. Czuczman about Plaintiff's ability to work if she is completely credible as to the severity of her condition:

> Q:    If Ms. Evans's testimony is considered good and credible, simply meaning that the evidence supports her testimony and as a result of the residuals of her conditions, primarily non-exertional related to her bipolar and other mental issues she complained about, as well as the residuals of her occasional pain and discomfort she has from her back and jaw areas, that the ability to maintain a sufficient level of attention, concentration and pace would rise to the level of marked. Marked meaning off task, even for unskilled work a third to two thirds of the day and absent from work due to the bad days she described. As I understand it, for more than, for unskilled work it would need to be more than two and it could be as many as four or five days in a 30 day window. If that would be the case would there be any jobs you could identify?

> A:    No, sir, such a person would not be capable of working.

> Q:    Okay. And with respect to the <u>Dictionary of Occupational Titles</u> is your testimony consistent?

> A:    Yes, Your Honor, it is.

(R. at 72-73.) Plaintiff's attorney chose not to question Mr. Czuczman when provided the chance. (R. at 73.)

A report of contact form dated May 8, 2008 states that Plaintiff is limited to basic tasks and

a non-severe exertional level.  (R. at 231.)  However, the form also states that Plaintiff "has no physical limitations that would interfer [sic] in her performing unskilled, low interaction work." (*Id.*)  According to the form, Plaintiff could function as a cleaner, mail clerk, or price marker.  (*Id.*)

## F.    *Lifestyle Evidence*

On an adult function report dated October 19, 2007, Plaintiff stated that she spends her days by getting her children ready for school, fixing meals, doing house chores, watching television, napping, bathing, and helping her husband get ready for work.[5]  (R. at 183.)  She also takes care of pets*.*  (R. at 184.)  When she does chores, she mows the lawn, gardens, does laundry, and cleans the house.  (R. at 185.)  However, Plaintiff noted that she sometimes needs encouragement to complete chores because she doesn't care if they get done unless she's experiencing a manic state.  (R. at 185.) Her mother, Rebecca Evans, informed the Administration that she often tells Plaintiff that chores need to be done and also gives a "helping hand."  (R. at 210.)  She goes outside "often."  (R. at 186.) Plaintiff reported that she shops one to two times per week for food, clothes, craft items, toys, and other household needs.  (*Id.*)  She stated that she is able to pay bills, count change, handle a savings account, and use a checkbook; however, she noted that she cannot budget and spends "out of control."  (R. at 186-87.)  Plaintiff enjoys reading and tries to finish a book every six months; she also enjoys scrapbooking and tries to scrapbook once a month.  (R. at 187.)  She reported that she spends time with others by shopping, talking on the phone, and visiting a few times a week and also travels to stores, places for her children, her counselor, and her doctor.  (*Id.*)  However, she stated that she tends to avoid group functions involving family or large crowds because they make her

---

[5] When Plaintiff submitted this adult function report, she was married and went by the name "Melissa C. Dean."  (R. at 183.)  However, Plaintiff is now divorced and goes by the name "Melissa Carrie Evans."  (R. at 39-40.)

stressed.  (R. at 188.)

On a second adult function report dated March 23, 2008, Plaintiff reported that she also does the dishes, but that she only does household chores when she makes herself or when someone tells her they need done.  (R. at 219.)  She also stated that she no longer does yard work because she has no yard.  (R. at 220.)  She goes outside "daily."  (R. at 220.)  Plaintiff noted that her ex-husband helps her care for her daughters because they share custody.  (R. at 218.)  She reported that it is hard for her to save money because she shops when she is depressed.  (R. at 220-21.)  Plaintiff enjoys walking and getting together with others for children's playdates and to eat.  (R. at 221.)  She tends to avoid "difficult people" and anyone whom she believes will cause her stress, such as her sisters. (R. at 222.)

In a third adult function report dated August 5, 2008, Plaintiff reported that she no longer prepares full course meals as much as before.  (R. at 244.)  She also noted that she spends time with others weekly and also visits her doctor and therapist on a regular basis.  (R. at 246.)  Furthermore, she stated that she and her sisters do not get along well and that she doesn't like to interact with people unless she's experiencing a manic stage.  (R. at 247.)  Plaintiff's mother reported that Plaintiff will have "some interaction with a good girl friend" about once a month.  (R. at 212.)

### III.   CONTENTIONS OF THE PARTIES

Plaintiff, in her motion for summary judgment, asserts that the Commissioner's decision "is based upon an error of law and is not supported by substantial evidence."  (Pl.'s Mot. at 1.) Specifically, Plaintiff alleges that:

•       The ALJ erred by improperly evaluating the opinion of Plaintiff's treating physician;

•       The ALJ erred by discounting Plaintiff's credibility without providing specific reasons; and

• The ALJ erred by finding that Plaintiff is capable of work existing in substantial numbers in the national economy.

(Pl.'s Mem. in Supp. of Mot. for Summ. J. ("Pl.'s Mem.") at 1-2, ECF No. 14.)[6]  Plaintiff asks the Court to "remand the case to the Commissioner with instructions to issue a new decision based on substantial evidence and proper legal standards."  (*Id.* at 9.)

Defendant, in his motion for summary judgment, asserts that the decision is "supported by substantial evidence and should be affirmed as a matter of law."  (Def.'s Mot. at 1.)  Specifically, Defendant alleges that:

• The ALJ properly evaluated the opinion of Dr. Siavashi;

• The ALJ's credibility determination should not be disturbed; and

• The ALJ's Step Five determination is supported by substantial evidence.

(Def.'s Br. in Supp. Of Def.'s Mot. for Summ. J. ("Def.'s Br.") at 19, 24, 26.)

## IV.    STANDARD OF REVIEW

The United States Court of Appeals for the Fourth Circuit ("Fourth Circuit") applies the following standards in reviewing the decision of an ALJ in a Social Security disability case:

> Judicial review of a final decision regarding disability benefits . . . is limited to determining whether the findings . . . are supported by substantial evidence and whether the correct law was applied.  *See* 42 U.S.C. § 405(g) ( "The findings . . . as to any fact, if supported by substantial evidence, shall be conclusive . . . .");  *Richardson v. Perales*, 402 U.S. 389, 390, 91 S. Ct. 1420, 1422 (1971); *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).  The phrase "supported by substantial evidence" means "such relevant evidence as a reasonable person might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. at 401, 91 S. Ct. at 1427 (citing *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S. Ct. 206,

---

[6] Plaintiff did not number the pages of her Memorandum in Support of Motion for Summary Judgment.  Therefore, when referring to Plaintiff's Memorandum, the Court will utilize the page numbers of the document filed using CM/ECF.

216 (1938)) . . . . If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). Thus, it is not within the province of a reviewing court to determine the weight of the evidence, nor is it the court's function to substitute its judgment . . . if the decision is supported by substantial evidence. *See Laws v. Celebrezze*, 368 F.2d at 642; *Snyder v. Ribicoff*, 307 F.2d 518, 529 (4th Cir. 1962).

*Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). The Fourth Circuit has defined substantial evidence as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. *Laws,* 368 F.2d at 642.

Because review is limited to whether there is substantial evidence to support the ALJ's conclusion, "[t]his Court does not find facts or try the case *de novo* when reviewing disability determinations." *Seacrist v. Weinberger*, 538 F.2d 1054, 1056-57 (4th Cir. 1976). Furthermore, **"the language of § 205(g) . . . requires that the court uphold the decision even should the court disagree with such decision as long as it is supported by 'substantial evidence.'"** *Blalock v. Richardson*, 483 F.2d 773, 776 (4th Cir. 1972) (emphasis added).

## V. DISCUSSION

### A. Standard for Disability and the Five-Step Evaluation Process

To be disabled under the Social Security Act, a claimant must meet the following criteria:

An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work . . . . "[W]ork which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

*See* 42 U.S.C. § 423(d)(2)(A) (2006). The Social Security Administration uses the following

five-step sequential evaluation process to determine if a claimant is disabled:

> (i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled.

> (ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.

> (iii) At the third step, we also consider the medical severity of your impairments(s). If you have an impairment(s) that meets or equals one of our listings . . . and meets the duration requirement, we will find that you are disabled.

> [Before the fourth step, the residual functioning capacity of the claimant is evaluated based "on all the relevant medical and other evidence in your case record . . . ."
> 20 C.F.R. §§ 404.1520; 416.920 (2011).]

> (iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled.

> (v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. §§ 404.1520; 416.920 (2011). If the claimant is determined to be disabled or not

disabled at any of the five steps, the process does not proceed to the next step. *Id.*

**B.** ***Discussion of the Administrative Law Judge's Decision***

Utilizing the five-step sequential evaluation process described above, the ALJ made the

following findings:

**1.** **The claimant has not engaged in substantial gainful activity at any time relevant to this decision (20 CFR 416.920(b)).**

**2.** **The claimant has the following severe impairments: bipolar/mood disorder; borderline personality disorder; and alcohol abuse (20 CFR**

416.920(c)).

3.      The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4.      After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform the physical demands of work at all exertional levels.  She is limited to the performance of unskilled work that requires no rapid production, piece rate, or quota work and involves only occasional contact with supervisors, coworkers, and the public.

5.      The claimant is unable to perform any past relevant work (20 CFR 416.965).

6.      The claimant was born on May 4, 1975 and was 30 years old on the alleged disability onset date, which is defined as a younger individual age 18-44 (20 CFR 416.963).

7.      The claimant has at least a high school education and is able to communicate in English (20 CFR 416.964).

8.      Transferability of job skills is not material to the determination of disability due to the claimant's age (20 CFR 416.968).

9.      Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant number in the national economy that the claimant can perform (20 CFR 416.960(c) and 416.966).

10.     The claimant has not been under a "disability," as defined in the Social Security Act, at any time since August 30, 2007 (20 CFR 416.920(g)).

(R. at 13-23.)

C.      *Analysis of the Administrative Law Judge's Decision*

1.      **The ALJ Properly Evaluated Dr. Siavashi's Opinion**

Plaintiff's first assignment of error is that the ALJ improperly evaluated the opinion of her

treating physician, Dr. Ali Siavashi.  (Pl.'s Mem. at 5-6.)  Specifically, Plaintiff alleges that the ALJ

"completely misinterpreted" Dr. Siavashi's records in light of the letter he submitted to the Appeals Council after the ALJ's unfavorable decision.  (*Id.* at 6.)  The undersigned finds that Plaintiff's argument is without merit because Dr. Siavashi's letter is inconsistent with his own office records and because other substantial evidence supports the ALJ's decision.

### a.    *Dr. Siavashi's Letter Does Not Qualify as New Evidence*

The Social Security Act allows for a court reviewing the decision of an ALJ to remand the case to the Commissioner for further review upon the motion of the Commissioner before the Commissioner's Answer is filed.  42 U.S.C. § 405(g) (2006).  However, this may only be done "upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding."  *Id.*

In Plaintiff's case, Dr. Siavashi's letter, submitted to the Appeals Council after the ALJ's unfavorable decision, does not qualify as new evidence under 42 U.S.C. § 405(g).  First, this letter was part of the record when Plaintiff's case was filed with this Court for review, and so no good cause existed for the Commissioner to file a motion for remand before filing his Answer.  Furthermore, as discussed below, Dr. Siavashi's letter is not material because it is inconsistent with his own office notes and with the other substantial evidence supporting the ALJ's decision.

### b.    *Substantial Evidence Supports the ALJ's Decision to Not Assign Controlling Weight to the Opinions of Dr. Siavashi*

The opinion of a treating physician will be given controlling weight if the opinion is 1) well-supported by medically acceptable clinical and laboratory diagnostic techniques and 2) not inconsistent with other substantial evidence in the case record.  20 C.F.R. § 416.927(d)(2) (2011); *see also Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996); 20 C.F.R. § 404.1527(d) (setting forth the same standard for Title II of the Social Security Act).  When an ALJ does not give a treating

source opinion controlling weight and determines that the claimant is not disabled, the determination or decision "must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." SSR 96-2p, 1996 WL 374188, at *5 (July 2, 1996). However, "treating source opinions on issues that are reserved to the Commissioner are never entitled to controlling weight or special significance." SSR 96-5p, 1996 WL 374183, at *2 (July 2, 1996). For example, the Commissioner is responsible for determining whether a claimant is disabled or unable to work. 20 C.F.R. § 416.927(e)(1). Therefore, a medical source that offers an opinion on whether an individual is disabled or unable to work "can never ben entitled to controlling weight or given special significance." SSR 96-5p, 1996 WL 374183, at *5.

As an initial matter, even assuming that Dr. Siavashi's letter was before the ALJ when he issued his decision, his opinion that Plaintiff is not "suitable to work" is not entitled to controlling weight. (R. at 584.) As discussed above, determining whether an SSI applicant is disabled is reserved to the Commissioner. *See* 20 C.F.R. § 416.927(e)(1). Therefore, the ALJ would not have erred by not assigning controlling weight to the opinions Dr. Siavashi expressed in his July 12, 2010 letter.

Even assuming that Dr. Siavashi's letter was before the ALJ and did not contain an opinion of whether Plaintiff was able to work, his letter would not be entitled to controlling weight because it is inconsistent with the other substantial evidence in the record. 20 C.F.R. § 416.927(d)(2). Notably, Dr. Siavashi's letter is inconsistent with his own office notes. In his letter, Dr. Siavashi states that when he reviewed Plaintiff's "records and her description of her symptoms," Plaintiff

"has spent a considerable amount of time in the GAF range of 31-50." (R. at 584.) However, as evidenced by his office notes, Dr. Siavashi never assigned a GAF lower than 45 to Plaintiff. In fact, Dr. Siavashi only assigned a GAF of 45 to Plaintiff during two weeks in March 2010. (R. at 506, 509.) At eight other times, Dr. Siavashi assigned a GAF of 50, the highest score available in the 31-50 range. (R. at 449, 457, 503, 512, 514, 516, 528, 531.) However, Dr. Siavashi also often assigned GAFs as high as 65 (R. at 455, 461) and 60 (453, 459, 494, 496, 498, 501, 525.) Furthermore, in his letter, Dr. Siavashi states that Plaintiff's "symptoms are not caused by relationship decisions." (R. at 584.) However, this is inconsistent with Dr. Siavashi's note on December 4, 2009 that Plaintiff admitted that her moods "correlate directly with the status of her relationship with males" and his note that Plaintiff's "mood symptoms also seem to be closely related to her menstrual cycle as well." (R. at 524.) Furthermore, Dr. Siavashi assigned lower GAF scores–45 or 50–to Plaintiff at visits where she reported relationship issues. (R. at 449-50, 456-57, 503-04, 505-06, 508-09, 511-12, 513-14, 516-17, 527-28, 530-31, 570-71.) Therefore, because Dr. Siavashi's letter is inconsistent with his own notes, the ALJ properly did not assign controlling weight to Dr. Siavashi's opinion.

The letter submitted by Dr. Siavashi does not undermine the substantial evidence supporting the ALJ's decision because it is inconsistent with other medical evidence contained in the record. For example, Dr. Zheng's medical notes indicate that Plaintiff responded to her medication. (R. at 339, 341, 353, 464, 470, 472, 483, 489, 493.) Furthermore, Dr. Zheng frequently assigned GAF scores in the range of 51 to 60 to Plaintiff. (R. at 342, 344, 346, 351, 354, 467, 473, 481, 484, 486, 490, 492) and sometimes even rated her in the range of 61 to 70. (R. at 465, 471, 475). Dr. Zheng frequently rated Plaintiff's symptoms as "mild" or "moderate." (*See, e.g.,* R. at 339, 341, 343, 345,

464, 466, 470, 472, 474.)  Overall, Dr. Zheng, who treated Plaintiff for a longer period of time than Dr. Siavashi, never stated nor implied that Plaintiff was incapable of working.

Furthermore, other medical evidence supports the ALJ's determination that Plaintiff is not disabled.  Dr. Fremouw, who examined Plaintiff twice, found that Plaintiff benefitted from counseling and her medications and that she was experiencing a "moderate level of impairment." (R. at 285, 390.)  Furthermore, both state agency medical consultants who examined Plaintiff determined that her limitations did not call for an RFC allowance.  Dr. Comer stated that Plaintiff had the ability for "work related activity in a low stress/demand work environment that can accommodate some mood lability and her physical limitations." (R. at 371.)  Dr. Roman concluded that Plaintiff "appears able to follow routine work in a low stress setting." (R. at 407.)

Having reviewed the record, the undersigned finds that Plaintiff's first assignment of error is without merit.  Not only did the ALJ not have Dr. Siavashi's July 12, 2010 letter before him when making his determination, but it would not have changed his decision because it is inconsistent with the substantial medical evidence supporting the ALJ's decision.

### 2.      Substantial Evidence Supports the ALJ's Credibility Determination

As her second assignment of error, Plaintiff alleges that the ALJ provided "insufficient reasoning" for his "unfavorable credibility assessment" of Plaintiff. (Pl.'s Mem. at 7.)  Specifically, Plaintiff argues that the record demonstrates many consistent statements made by her regarding her impairments and that consistency is a strong indication of her credibility.  (*Id.*)  However, the undersigned finds that Plaintiff's objection is without merit because the ALJ provided a sufficiently specific explanation of his findings.

At a minimum, the Social Security Act requires that the ALJ's decision "must contain

specific reasons for the finding on credibility, supported by the evidence in the case record."  SSR 96-7p, 1996 WL 374,186, at *2.  "Because he had the opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight."  *Shively v. Heckler*, 739 F.2d 987, 989-90 (4th Cir. 1984).  This Court has determined that "[a]n ALJ's credibility determinations are 'virtually unreviewable' by this Court."  *Ryan v. Astrue*, No. 5:09CV55, 2011 WL 541125, at *3 (N.D. W.Va. Feb. 8, 2011) (Stamp, J.).  If the ALJ meets his basic duty of explanation, "[w]e will reverse an ALJ's credibility determination only if the claimant can show it was 'patently wrong.'"  *Sencindiver v. Astrue*, No. 3:08-CV-178, 2010 WL 446174, at *33 (N.D. W.Va. February 3, 2010) (Seibert, Mag.) (quoting *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000)).

The ALJ determined that "the claimant has exaggerated the nature and severity of her impairments and that her complaints of disabling pain and functional limitations are not fully credible."  (R. at 22.)  Furthermore, the ALJ noted that Plaintiff's daily activities, as he described in his decision, "are inconsistent with her complaints of disabling pain and functional limitations."  (*Id.*)  Overall, the ALJ found that Plaintiff was not entirely credible because she had been stable for most of the period in question and because many of her difficulties have responded to medication.  (*Id.*)

Substantial evidence supports the ALJ's determination that Plaintiff is not entirely credible.  At the hearing, Plaintiff testified that she has difficulty with going out in public because her "skin starts to crawl," she experiences nausea, and always has to leave.  (R. at 57.)  However, this statement is inconsistent with Plaintiff's Adult Function Report dated August 19, 2007, in which she stated that she spends time with others a couple times a week and goes shopping about one to two

times per week for items such as food and clothing. (R. at 186, 187.) On March 23, 2008, Plaintiff

reported in a second Adult Function Report that she visits others "as often as [she] can handle." (R.

at 221.) On August 5, 2008, Plaintiff reported in a third Adult Function Report that she spends time

with others weekly. (R. at 246.) She also reported regularly taking her children to activities and

going to doctor's appointments. (R. at 187.) Furthermore, multiple sources in the record document

Plaintiff's many visits to local bars to meet men. (*See, e.g.,* R. at 449, 454, 494, 496, 503, 505, 508,

522, 524, 527, 570, 575.) Finally, Dr. Siavashi noted multiple times that Plaintiff appeared

"sociable" during her appointments with him. (*See, e.g.,* R. at 450, 454, 456, 458.)

Plaintiff also testified that she has no problems with taking care of her personal hygiene

except a few times per year when she gets "in a funk" and doesn't shower or leave her apartment

for three or four days. (R. at 61-62.) However, Plaintiff told Dr. Fremouw twice that she "bathes

daily." (R. at 286, 389.) Furthermore, Plaintiff herself reported on three Adult Function Reports

that she has no problems with personal care. (R. at 184, 218, 243.) Plaintiff's mother, Rebecca

Evans, corroborated this on a Third Party Adult Function Report she completed on March 16, 2008

(R. at 209-10.)

During the hearing, Plaintiff testified that her disorders affect her ability to read because she

has "to go back and read the pages over." (R. at 64.) According to Plaintiff, it now takes her

approximately four or five days to read what used to take her an hour to read. (*Id.*) However,

multiple sources in the record document that Plaintiff's concentrate and memory were either within

normal limits or mildly to moderately impaired. (R. at 285, 297, 383, 389, 401, 405.) She also

testified that her medication regimen was "not doing real well." (R. at 53.) However, five days

before the hearing, at her appointment with Dr. Siavashi, Plaintiff stated that her Seroquel was

helping with "racing thoughts" and had "decreased the intensity of her obsessive thoughts regarding various men in her life." (R. at 495.) Furthermore, she stated that the Klonopin was helping her with insomnia. (*Id.*)

Having reviewed the record, the undersigned finds that the ALJ provided a sufficient explanation for discounting the Plaintiff's credibility. Furthermore, the undersigned cannot say that the ALJ's credibility determination is "patently wrong" – the inconsistencies between Plaintiff's statements at the hearing and the evidence contained in the record tend to support the ALJ's determination that the Plaintiff was not entirely credible in describing her symptoms and pain. *See Sencindiver,* 2010 WL 446174, at *33 (quoting *Powers*, 207 F.3d at 435). Accordingly, substantial evidence supports the ALJ's credibility determination.

**3.      Substantial Evidence Supports the ALJ's Step Five Determination That Plaintiff Is Capable of Work**

As her third assignment of error, Plaintiff alleges that because the ALJ failed to give appropriate weight to the medical evidence and improperly discounted Plaintiff's credibility, he "failed to adequately include the limitations presented by [her] impairments in hypotsheticals [sic] to the VE." (Pl.'s Mem. at 9 (alteration in original).) However, Plaintiff's argument is without merit because substantial evidence supports the ALJ's determination that Plaintiff is capable of work that exists in substantial numbers in the national economy.

If a claimant has met her burden of showing that she is not able to perform her past relevant work, the Commissioner then has the burden of showing that the claimant is able to perform work existing in significant numbers in the national economy. *See McLamore v. Weinberger*, 538 F.2d 572, 574 (4th Cir. 1976). During the fifth step of the sequential analysis, the ALJ must pose hypotheticals to the Vocational Expert ("VE") that "fairly set out all of [the] claimant's

impairments." *Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989) (alteration in original); *see also*

*Johnson v. Barnhart*, 434 F.3d 650, 659 (4th Cir. 2005) (hypotheticals must "adequately" describe

the claimant's impairments). However, the ALJ need only include those limitations supported by

the record in the hypotheticals. *Johnson*, 434 F.3d at 659. Furthermore, an ALJ is not required to

"submit to the [VE] every impairment alleged by a claimant." *Rutherford v. Barnhart*, 399 F.3d

546, 554 (3d Cir. 2005) (alteration in original).

Here, Plaintiff's third assignment of error restates her other two assignments of error

because she claims that the ALJ failed to assign the proper weight to the medical evidence and to

her credibility, and so this caused him to pose "flawed" hypotheticals to the VE. (Pl.'s Mem. at 9.)

At the hearing, the VE confirmed that he had received adequate time "to review, at least, the CD of

all the exhibits in the file." (R. at 70.) In his hypothetical, the ALJ included a profile of an

individual between the ages of 32 and 35 with a high school education and one year of college. (R.

at 71.) The ALJ's profile also limited the individual to "unskilled work," "occasional contact with

supervisors, coworkers, and the public," and "no rapid production, piece rate or quota work" (low

stress work). (*Id.*) ) This profile was derived from the Mental Residual Functional Capacity

Assessments completed by Dr. Comer and Dr. Roman, the two assessments completed by Dr.

Fremouw, and the various medical evidence. (*See* R. at 21-22, 283-86, 369-72, 387-90, 405-08.)

In response, the VE determined that Plaintiff could perform such jobs as a lumber handler, scrap

sorter, machine cleaner, and laminator. (R. at 72.) For example, the ALJ found the opinion

evidence consistent with the state agency assessments indicating a "moderate impairment" because

the majority of Plaintiff's GAF ratings fell between 51 and 60. (R. at 22; *see, e.g.,* R. at 342, 346,

369-70, 390, 405-07, 453, 455, 459, 465, 467, 473, 475, 481, 484, 486, 490, 492.) Accordingly,

because substantial evidence supports the ALJ's findings concerning the medical evidence and Plaintiff's credibility, he only needed to include the limitations supported by the record in his hypotheticals. *See Johnson*, 434 F.3d at 659.

Plaintiff also suggests that when the ALJ posed "appropriate questions" to the VE, the VE testified that all available jobs for Plaintiff would be eliminated. (Pl.'s Mem. at 9.) In making this argument, Plaintiff refers to the ALJ's second hypothetical, where he asked what jobs would be available if Plaintiff's "testimony is considered good and credible" and if her "level of attention, concentration and pace" were as intense and frequent as she testified. (R. at 72-73.) Here, the ALJ did submit a hypothetical to the VE containing impairments as alleged by Plaintiff. The VE responded that "such a person would not be capable of working. (R. at 73.) However, an ALJ is not required to accept the answers a VE gives to a hypothetical that contains limitations not ultimately adopted by the ALJ. *See Hammond v. Apfel*, 5 F. App'x 101, 105, 2001 WL 87460, at *4 (4th Cir. Feb. 1, 2001) (citing *Martinez v. Heckler*, 807 F.2d 771, 774 (9th Cir. 1986)). As discussed previously, the ALJ did not ultimately adopt the limitations contained in this second hypothetical after weighing the medical evidence and finding Plaintiff to be not entirely credible. Therefore, substantial evidence supports the ALJ's Step Five determination that Plaintiff is capable of work existing in substantial numbers in the national economy.

## VI.    RECOMMENDATION

For the reasons herein stated, I find that the Commissioner's decision denying the Plaintiff's application for Disability Insurance Benefits and Supplemental Security Income is supported by substantial evidence. Accordingly, I **RECOMMEND** that Plaintiff's Motion for Summary Judgment (ECF No. 13) be **DENIED**, Defendant's Motion for Summary Judgment (ECF No. 17) be

**GRANTED**, and the decision of the Commissioner be affirmed and this case be **DISMISSED WITH PREJUDICE**.

Any party may, within fourteen (14) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable Frederick P. Stamp, Jr., United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); *Thomas v. Arn,* 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v Schronce*, 727 F.2d 91 (4th Cir. 1984), *cert. denied*, 467 U.S. 1208 (1984).

The Court directs the Clerk of the Court to provide a copy of this Report and Recommendation to all counsel of record, as provided in the Administrative Procedures for Electronic Case Filing in the United States District Court for the Northern District of West Virginia. Respectfully submitted this **14th** day of **October, 2011.**

DAVID J. JOEL
UNITED STATES MAGISTRATE JUDGE